UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
                                    )
            Plaintiff,              )
                                    ) Case No.
            vs.                     ) 14-CR-3106-MDH-22
                                    )
                                    )
BRANDON A. HOUSE,                   )
                                    )
            Defendant.              )



CHANGE OF PLEA
BEFORE THE HONORABLE M. DOUGLAS HARPOOL
TUESDAY, DECEMBER 13, 2016; 2:07 P.M.
SPRINGFIELD, MISSOURI




APPEARANCES:

FOR THE PLAINTIFF:          MR. RANDALL D. EGGERT
                            UNITED STATES ATTORNEY'S OFFICE
                            901 St. Louis, Ste. 500
                            Springfield, MO 65806


FOR THE DEFENDANT:          MR. DARRYL B. JOHNSON
                            DARRYL JOHNSON ATTORNEY AT LAW
                            1885 N. Highway CC, Ste. A
                            Nixa, MO 65714


COURT REPORTER:             MS. JEANNINE RANKIN, RPR, CSR
                            UNITED STATES DISTRICT COURT
                            222 N. Hammons Parkway
                            Springfield, MO 65806


    Proceedings recorded by mechanical stenography;
transcript produced by computer.

USA v BRANDON A. HOUSE

2                    CASE NO. 14–CR–3106–MDH–22

3                         CHANGE OF PLEA

4                        December 13, 2016

5                        *   *   *   *   *   *

6            THE COURT:  We are here to consider a potential plea

7    from Brandon House.  Who appears on behalf of the United

8    States?

9            MR. EGGERT:  Randy Eggert for the United States,

10   Your Honor.

11           THE COURT:  And on behalf of the defendant?

12           MR. JOHNSON:  Darryl Johnson on behalf of Brandon

13   House, Your Honor.

14           THE COURT:  Mr. House, would you stand.

15           My understanding, counsel, is that your client is

16   interested in entering a plea but it's a stand–up plea, no

17   plea agreement; is that correct?

18           MR. JOHNSON:  Yes, sir, that's correct.

19           THE COURT:  All right.

20           Mr. House, my name's Doug Harpool.  I'm the federal

21   district judge that is presiding over your case.  It's my job

22   to make sure that you get all the rights you're entitled to,

23   that we follow the rules of procedure and that the laws are

24   enforced as they should be.

25           You have previously entered a plea of not guilty.

                                    2

1  That means under the eyes of our laws that it's presumed that
2  you're innocent and you'll keep that presumption unless one of
3  two things happens:  Either you change your plea or until you
4  go to trial and a jury were to find you guilty.

5          I've been advised that you want to change your plea.
6  That's not unusual.  That happens frequently in court.  But in
7  order for us to allow you to change your plea, I have to make
8  sure the circumstances around that decision are appropriate,
9  that you've been properly advised of the circumstances of the
10 plea and that your plea is something you're entering into
11 voluntarily.  Do you understand that's why we're here today?
12          THE DEFENDANT:  Yes, sir.
13          THE COURT:  Now, in order for me to make a finding,
14 I have to have evidence to rely on.  That means that I'm going
15 to place you under oath and ask you questions and your
16 testimony will be the evidence on which I rely.  That means
17 because you're under oath, it's going to be important that you
18 be sure you tell the truth and that you listen carefully to my
19 questions.  Ask me to rephrase any question you don't
20 understand.  Okay?
21          THE DEFENDANT:  Yes, sir.
22          THE COURT:  All right.  Raise your right hand.
23          (Defendant duly sworn by Court.)
24          THE COURT:  State your full name, please.
25          THE DEFENDANT:  Brandon Allen House.

```
 1                 THE COURT:  How old are you?

 2                 THE DEFENDANT:  Thirty-three.

 3                 THE COURT:  Can you read and write?

 4                 THE DEFENDANT:  Yes, sir.

 5                 THE COURT:  Have you read the second superseding

 6      indictment on which you've been named a defendant?

 7                 THE DEFENDANT:  Yes, sir.

 8                 THE COURT:  I know there's lots of defendants named

 9      but the particular counts that you are named on are Counts 1

10      and 25 of the second superseding indictment, so I'm

11      particularly interested that you've read those two counts.

12      Are you confident you have?

13                 THE DEFENDANT:  Yes, sir.

14                 THE COURT:  Have you had the opportunity to discuss

15      those allegations against you with your lawyer?

16                 THE DEFENDANT:  Yes, sir.

17                 THE COURT:  Have you also -- I don't want you to

18      tell me anything your lawyer told you, but have you had

19      discussions with your lawyer about the strengths and the

20      weaknesses of the government's case against you?

21                 THE DEFENDANT:  Yes, sir.

22                 THE COURT:  Have you had discussions with your

23      lawyer about the rights you'd have if you went to a jury

24      trial?

25                 THE DEFENDANT:  Yes, sir.
```

4

THE COURT:  And about the –– if you are guilty, some
of the benefits in sentencing if you were to admit your guilt
rather than to proceed to trial and be found guilty?

                    THE DEFENDANT:  Yes, sir.

                    THE COURT:  I'm going to ask your lawyer.

                    Mr. Johnson, have you had sufficient discovery from
the government that you feel you're in a position you know the
strengths and weaknesses of the government's case against your
client?

                    MR. JOHNSON:  Yes, sir, Your Honor.

                    THE COURT:  Have you had sufficient time to discuss
the strengths and weaknesses of that case with your client?

                    MR. JOHNSON:  Yes, sir, I have.

                    THE COURT:  Mr. House, have you had the time to ask
your lawyer all the questions you had about the decision to
change your plea?

                    THE DEFENDANT:  Yes, sir.

                    THE COURT:  Do you feel you understand the
consequences of changing your plea?

                    THE DEFENDANT:  Yes, sir.

                    THE COURT:  I'm going to ask you some additional
questions in a minute to just go over a few of the highlights
to make sure on the record that you understand that.  I'm not
doubting your lawyer asked you all those things but we try to
make a record in court so that's the reason I'm going to go

                                        5

1    over some of those things myself.

2            First, I need to do some things also for the record.

3    As you stand here today, are you under the influence of any

4    narcotic or drug?

5            THE DEFENDANT:  No, sir.

6            THE COURT:  Any alcohol?

7            THE DEFENDANT:  No, sir.

8            THE COURT:  Do you suffer any mental illness?

9            THE DEFENDANT:  No, sir.

10           THE COURT:  Do you know of any reason why you're not

11   competent to make the decision to change your plea?

12           THE DEFENDANT:  No, sir.

13           THE COURT:  If at any time I ask you a question you

14   don't understand, don't answer it.  Okay?  Let's stop and --

15   what's your educational background?

16           THE DEFENDANT:  Thirteen, little bit of college.

17           THE COURT:  You can read and write?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  You didn't have any trouble reading the

20   second superseding indictment when you tried to read it; is

21   that correct?

22           THE DEFENDANT:  No.

23           THE COURT:  Let me -- there are lots of defendants

24   in this case, lots of co-conspirators or alleged

25   co-conspirators.  It's important for me to understand and I

6

1  want to make sure, has anybody put any pressure on you or your

2  family or someone you care about to try to coerce you into

3  admitting guilt or changing your plea to guilty?

4         THE DEFENDANT:  No, sir.

5         THE COURT:  Has anybody made any promises that if

6  you would just go ahead and plead guilty, we'll do something

7  favorable for you or your family?

8         THE DEFENDANT:  No, sir.

9         THE COURT:  Is the decision to change your plea to

10 guilty -- pleas to guilty a decision that you have come to

11 voluntarily given the circumstances you find yourself in?

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  Do you think given where you are and the

14 conversations you've had that pleading guilty is what is in

15 your best legal interest?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  Now, Count 1 is one of the counts that

18 is pending against you.  Under Count 1 if you're guilty you

19 will face a sentence of not less than ten years in prison --

20        MR. EGGERT:  Your Honor, if I may?  The defendant --

21 we filed an 851 on this particular defendant, so I can recite

22 to the Court what I believe the statutory provisions would be.

23        THE COURT:  It would be 20 years, correct?

24        MR. EGGERT:  It would be 20 years, Your Honor,

25 statutory maximum would be life, not less than ten years of

                               7

1    supervised release, a $20 million fine, and a $100 mandatory

2    special assessment, and that offense would be a Class A

3    felony.

4              THE COURT:  Because of the -- what's been filed by

5    the government and your background, you understand you'd

6    actually be facing a sentence of not less than 20 years in

7    addition to the other things that Mr. Eggert just said?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Then also Count 25.  Count 25, what's --

10   I'll have you read that.

11             MR. EGGERT:  Yes, Your Honor, I'd be happy to.

12             Count 25, because of the 851 enhancement, there is

13   no statutory minimum penalty.  The statutory maximum penalty

14   is not more than 30 years imprisonment, at least six years

15   supervised release, a $2 million fine, and a $100 mandatory

16   special assessment for conviction which must be paid at the

17   time of sentence.  This offense is a Class B felony.

18             THE COURT:  Are you aware that that's the punishment

19   you'd face under Count 25 if you plead guilty to that?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Now, the sentences read by Mr. Eggert

22   are those that are authorized by the Congress.  Now, your

23   actual sentence is one that I'll make the decision on but I

24   have to do something that's authorized by the Congress.  So do

25   you understand that in calculating your sentence we'll

8

calculate what we call the sentencing guidelines promulgated
by the U.S. Sentencing Commission and those guidelines means
that I'll give an offense level to you based on those
guidelines and we'll calculate your criminal history and based
on those and the authorized sentence, then we'll come to
what's called the guideline sentence for you.  Do you
understand that?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Have you had some general discussions
with your lawyer about that process?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Today there's just a few things I want
to make sure you understand.  One is that a guideline sentence
is a guideline but your actual sentence can be below or above
that guideline as long as it's within that authority that the
Congress has given that was read by Mr. Eggert.  Do you
understand that?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  Secondly, you're in federal court and in
federal court we don't recognize parole.  So while in some
state courts you might hear of people getting a long sentence
but only serving a fraction of it, that's not how it is here
in federal court.  When you receive a sentence, you should
expect to serve it all.  Do you understand that?

        THE DEFENDANT:  Yes, sir.

9

THE COURT:  There's a few small exceptions to that
but generally you should expect to serve it all.  Do you
understand that?

         THE DEFENDANT:  Yes, sir.

         THE COURT:  Today I'm going to be taking your plea,
if I find the circumstances appropriate, but your sentencing
won't be for some time.  Do you understand that if on the day
down the road when you learn your sentence you're disappointed
with it, that that's not going to be an excuse for you to come
back and try to reverse the plea that you entered today?  Do
you understand that?

         THE DEFENDANT:  Yes, sir.

         THE COURT:  In federal court we do have something
called supervised release.  That's a period of time after
you've completed whatever period of incarceration you may
receive in which you have to follow rules and perhaps submit
to testing and other conditions that I'll establish on the day
of your sentencing.  If you don't follow those conditions and
rules, you can actually receive even additional prison time
and have to go back to prison.  Do you understand that?

         THE DEFENDANT:  Yes, sir.

         THE COURT:  The periods of time were read by
Mr. Eggert later as to how long your supervised release can
go.  Do you understand that?

         THE DEFENDANT:  Yes, sir.

Case 6:14-cr-03106-MDH   Document 1040   Filed 08/23/17   Page 10 of 29

```
 1              THE COURT:  Go for life, can't it, on that one

 2   count?

 3              MR. EGGERT:  Yes.  Yes.

 4              THE COURT:  All right.  Now let's talk about your

 5   right to jury trial.  All right?  You have a right to maintain

 6   your not guilty plea and to go to jury trial.  If you go to

 7   jury trial, there will be 12 jurors that are selected from our

 8   community and all 12 of them have to believe you're guilty

 9   beyond a reasonable doubt or you will not be guilty in the

10   eyes of the law.  Do you understand that?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  The government has the burden of proof

13   to convince those jurors; you don't have that burden.  Do you

14   understand that?

15              THE DEFENDANT:  Yes, sir.

16              THE COURT:  At trial if you can't afford a lawyer,

17   one would be provided for you, and your lawyer can confront,

18   impeach, cross-examine every single piece of evidence and

19   every witness that the government calls against you.  Do you

20   understand that?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  In addition, he can call witnesses to

23   testify on your behalf.  If there's a witness who's reluctant

24   to testify, I can use the power of my court to compel them to

25   come to court and testify.  Do you understand that?
```

11

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  At trial you would have the right to be

3     called as a witness to testify on your own behalf, but if you

4     wish to remain silent, that also would be your right and no

5     one could force you to get on the stand and testify.  I would

6     even instruct the jury that they should not reach any type of

7     adverse inference just because you took advantage of your

8     constitutional right.  Do you understand that?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  At jury trial if I made a mistake in a

11    ruling of law or evidence, you could appeal me to a higher

12    court, to the Eighth Circuit, and try to get that Court to

13    reverse my rulings.  Do you understand that?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Now, this jury trial that I've been

16    describing, the purpose of that trial is to determine whether

17    you're guilty or not.  If you're guilty, you lose the

18    presumption of innocence.  All right?  If you admit you're

19    guilty to me today and plead guilty, there's no need for that

20    trial and you'll not be taking advantage of all those rights

21    associated with jury trial that I just discussed with you.  Do

22    you understand that?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  In the eyes of the law if you plead

25    guilty you are guilty so there's no reason to have a jury

1   trial to determine it and instead we'll go on to the
2   sentencing phase and procedures that our court uses.  Do you
3   understand that?
4           THE DEFENDANT:  Yes, sir.
5           THE COURT:  I can't accept a guilty plea unless I
6   believe there is evidence that the government could present to
7   a jury that a jury if they believe that evidence would find
8   would be sufficient to find you guilty.  All right?  So as
9   part of this proceeding to accept your guilty plea, we have to
10  talk about what evidence the government thinks it could prove
11  if it went to trial.  This evidence is important because it
12  provides the basis for me to accept your plea but the
13  specifics on what you admit can sometimes also impact those
14  sentencing guidelines I told you about earlier because they
15  could impact the offense level that is assigned to you for
16  your conduct under those guidelines.
17          So, Mr. Eggert, you have provided me with a written
18  copy of what you think the government's evidence would be.
19  Has that also been provided to Mr. Johnson?
20          MR. JOHNSON:  Yes, sir, it has.
21          THE COURT:  All right.  Do you wish to read that
22  into the record or is it in such a condition that the
23  defendant could merely sign it and submit it as an exhibit?
24          MR. EGGERT:  For purposes of this record, if I could
25  read it into the record, Your Honor, I would -- if I could.

13

1          THE COURT:  That's fine with me.  I do think -- it's
2    fairly lengthy, so I think it would be appropriate if
3    Mr. Johnson and his client could follow along in writing as
4    you read it.
5          MR. EGGERT:  Yes.
6          THE COURT:  Very important, Mr. House, you listen
7    carefully what's going to be read in the record.
8          MR. EGGERT:  Before I start, Your Honor, I would
9    also point out that as part of the plea agreement here
10   today -- the plea hearing here today the defendant is also
11   admitting and acknowledging the forfeiture of money --
12   Forfeiture Allegations 1 and 2 of the second superseding
13   indictment, and I'll be getting into that with the factual
14   basis that I'm about to read into the record.
15         THE COURT:  All right.  Before you proceed, then --
16   I guess I forgot that.
17         You understand that in the second superseding
18   indictment there is what they call forfeiture allegations and
19   that means allegations that people should lose property as a
20   result of their involvement in this crime and either they used
21   the property in the crime or they have used the proceeds of
22   the crime to obtain the property?  Forfeiture allegation does
23   mention you.  It refers to $4,000 in currency.  And then
24   Forfeiture Allegation 2 refers to you and it refers to $13,850
25   in currency.

14

1          As part of your plea do you understand that if I

2     accept your plea, you will be acknowledging that you have no

3     interest in that cash and that any interest you ever had in

4     that cash you would be forfeiting and losing?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  All right.  Now proceed.

7               MR. EGGERT:  Thank you, Your Honor.

8               Between June 1st of 2013 through November 29th of

9     2014, said dates being approximate, in Greene, Polk,

10    Christian, Jasper, Laclede, and Webster Counties in the

11    Western District of Missouri and elsewhere, the defendant,

12    Brandon A. House, knowingly and intentionally conspired and

13    agreed with others to distribute 500 grams or more of a

14    mixture or substance containing a detectible amount of

15    methamphetamine, a Schedule II controlled substance, in

16    violation of Title 21, United States Code, Section 846 and

17    841(a)(1) and (b)(1)(A).  This is Count 1 of the indictment,

18    of the second superseding indictment.

19              Also, on July 8th of 2014 in Christian County, in

20    the Western District of Missouri and elsewhere, the defendant,

21    Brandon A. House, knowingly and intentionally possessed with

22    intent to distribute a mixture or substance containing a

23    detectible amount of methamphetamine, a Schedule II controlled

24    substance, in violation of Title 21, United States Code,

25    Section 841(a)(1) and (b)(1)(C).  This is Count 25 of the

1   second superseding indictment.

2           Beginning in 2012 the United States Drug Enforcement

3   Administration, hereinafter DEA, assisted by the United States

4   Internal Revenue Service, herein IRS, the Missouri State

5   Highway Patrol, hereinafter MSHP, the Springfield Missouri

6   Police Department, hereinafter SPD, and other affiliated law

7   enforcement agencies investigated a large scale

8   methamphetamine distribution network in southwest Missouri

9   involving several sources of supply both inside and outside of

10  the state of Missouri.

11          Leaders of this distribution network in southwest

12  Missouri were identified as Daniel and Kenna Harmon.  The

13  Harmon drug trafficking organization, hereinafter Harmon DTO,

14  obtained pound amounts of methamphetamine from sources of

15  supply in Kansas City, St. Louis, as well as from the state of

16  Oklahoma for distribution in the Springfield, Missouri, area.

17  The Harmon DTO distributed in excess of 45 kilograms of

18  methamphetamine from June 1st, 2013, to November 29th, 2014.

19  One of the persons that obtained methamphetamine from the

20  Harmon DTO for redistribution was the defendant, Brandon

21  House.

22          On December 12th of 2013, SPD executed a state

23  search warrant at a residence of a female in Springfield,

24  Missouri.  Inside the residence were Jeffrey Gardner, the

25  defendant, House and a female.  A search of the residence

16

revealed a baggie of methamphetamine and $4,000 in United
States currency which was seized by SPD officers.  The money
was drug proceeds derived from the conspiracy as charged in --
the conspiracy to distribute methamphetamine as charged in
Count 1 of the second superseding indictment.

On January 27th of 2014, House, along with the
female, was vehicle stopped in the area of Bennett Street and
Kansas Expressway in Springfield, Missouri.  The female was
driving the vehicle and House was the front seat passenger.
The vehicle had just left the house in Springfield, Missouri,
where methamphetamine was suspected of being sold.  After the
stop, officers discovered $13,850 inside the vehicle.  This
money was drug proceeds derived from the conspiracy to
distribute methamphetamine as charged in Count 1 of the second
superseding indictment.

I should mention, the first amount of money that was
seized, the $4,000, refers to Forfeiture Allegation 1 and the
second amount, $13,850, refers to Forfeiture Allegation 2.

On July 8th, 2014, members of the COMET Drug Task
Force conducted a check of a suspicious person inside a
vehicle parked in a residential driveway in the area of Old
Limey Road in Nixa, Christian County, Missouri.  An officer
with the Christian County Sheriff's Department arrived at the
location and observed a male passed out inside the vehicle.
The male was identified as the defendant, House.  The

1  Christian County Deputy Sheriff discovered 33.66 grams of
2  methamphetamine, .77 grams of cocaine, $840 in United States
3  currency, pills, blotting paper which appeared to be LSD, and
4  glass smoking pipes.

5       Beginning in September of 2014 and continuing until
6  November 27th, 2014, a series of T-III wiretaps were placed on
7  four different telephones used by Kenna Harmon.  During the
8  wiretap monitoring, House contacted Harmon on numerous
9  occasions to arrange for the purchase of methamphetamine.

10      On October 11th of 2014 at approximately 10:53 in
11 the evening, House contacted Harmon via the telephone to
12 schedule a meeting.  Over the course of several telephone
13 calls, House and Harmon agreed to meet in a neighborhood in
14 the vicinity of Sunshine Street and Campbell Avenue which
15 would be located in Springfield, Missouri.  Harmon stated that
16 she would have his stuff in a department store bag and that
17 House would provide her with a little package in exchange.

18      DEA agents conducting surveillance observed Harmon
19 travel in a 2004 blue BMW sedan to the location of Sunshine
20 Street and Campbell Avenue where Harmon parked her car.  A
21 Cadillac Escalade then entered the lot and a male got out of
22 the vehicle and entered Harmon's BMW.  This male, by the way,
23 would have been Mr. House.  The BMW left the parking lot,
24 traveled eastbound on Sunshine Street to Glenstone Avenue,
25 made a U-turn and then returned to the parking lot where the

                              18

1  male got out of the BMW and got back into the Escalade.  Both
2  vehicles then left the parking lot.

3         On October 12th, 2014, Harmon and House had
4  additional telephone contacts which were captured by the T-III
5  wiretap.  At 5:55 in the evening, House contacted Harmon by
6  telephone and asked where they should meet.  House told Harmon
7  that he was at the Mexican restaurant next to the Midnight
8  Rodeo.  Agents then set up surveillance in the area of
9  Glenstone Avenue and Sunshine Street where the Midnight Rodeo
10 was located.

11        Agents once again observed the Escalade and Harmon's
12 BMW at the El Charro Mexican restaurant located in the area.
13 About 30 minutes after the agent started the surveillance they
14 observed House and an unknown female leaving the restaurant.
15 Harmon next exited the restaurant with her son.  House, Harmon
16 and Harmon's son then entered Harmon's BMW.  Harmon entered on
17 the front seat side of the BMW and House entered in the front
18 passenger side of the vehicle.  The female entered the
19 Escalade.  Harmon then exited her vehicle and opened the trunk
20 of the BMW.  Harmon then removed a plastic department store
21 bag from the trunk of the vehicle.  Harmon then reentered the
22 BMW with the bag.

23        At this point the BMW driven by Harmon with House as
24 a passenger and the Escalade driven by the unknown female
25 traveled to the parking lot of the Fazoli's restaurant located

Case 6:14-cr-03106-MDH   Document 1040   Filed 08/23/17   Page 19 of 29

1  in the vicinity of North Glenstone Avenue.  At this location

2  House exited the BMW, entered the Escalade and the officers

3  followed the Escalade to House's residence on East Central

4  Street.  Surveillance followed Harmon to one of her residences

5  located on North Travis.

6            Also on October 12th, 2014, after these meetings

7  Harmon and House exchanged telephone calls which were

8  monitored on the T-III.  At 7:39 in the evening Harmon placed

9  an outgoing communication to House.  House did not answer the

10 phone so Harmon left a message asking House if he grabbed her

11 blue mesh bag.  At 7:41 Harmon then contacted House again by

12 telephone which was monitored by the T-III.  Harmon told House

13 that all she had was in that bag.  House stated he knows and

14 asked Harmon what she wanted him to do.  Harmon told him that

15 when he got ready to leave to let her know and she would meet

16 him somewhere.  Harmon stated that, I'll grab it wherever you

17 are and just so you don't have to travel with it.  There would

18 be an amount in there that is inaudible according to the T-III

19 getting caught with.  House stated that he thought he was

20 supposed to take the whole bag.  Harmon said, No, I told you

21 something was inside that blue bag.  Harmon told House --

22 Harmon asked House if House was by the car wash.  House said

23 yes.  Another male in the background told House to tell Harmon

24 not to come over there.  House then told Harmon that he would

25 call her right back.  Agents conducting surveillance observed

1  Harmon's BMW travel to House's residence on East Central
2  Street after this telephone call.

3        On October 18th of 2014, House and Harmon conducted
4  another series of telephone calls.  During these telephone
5  calls Harmon discussed traveling to Joplin, Missouri, in order
6  to switch out 8 pounds of bad methamphetamine that customers
7  had complained about and replacing it with good
8  methamphetamine.  Surveillance on that day observed Harmon
9  driving her BMW and House driving a gold Camry travel to
10 Joplin and later appeared to meet with an unknown Hispanic
11 male at the North Town Mall at Joplin.

12        At 8:35 in the evening on October 18, House and
13 Harmon had a telephone conversation during which Harmon told
14 House about trying to meet Harmon's source.  The two discussed
15 having different phones to reach each other.  Harmon expressed
16 her frustration about how the meeting was going.  Harmon got
17 tired of waiting for her source to finalize a place to meet.
18 Harmon felt that she was getting the run-around.  Harmon's
19 source felt that they were being followed.  Harmon suggested
20 that she might lose $100,000 in the deal.  Harmon stated that
21 she was going to attempt to wash the suspected methamphetamine
22 in order to make it good.

23        On November the 15th of 2014, House and Harmon
24 conducted another series of telephone conversations monitored
25 by the T-III wiretap.  At 1:00 in the morning, 1 a.m., Harmon

contacted House and asked him if he was coming. House
replied, Not tonight. Harmon needed to know because she did
not know when she needed to carry his "shit." Harmon told
House that she had "two" for him and that he should not expect
"five." House stated that he got scared and did not want to
come. Harmon told House not to worry and she would see him
tomorrow.

I would say all these transactions that we referred
to, November 15th, October 18th, October 12th, and
October 11th all involved the distribution of methamphetamine
by Ms. Harmon to Mr. House or Mr. House's assistants in
obtaining methamphetamine in the conspiracy with Ms. Harmon.

On November 27th and November 28th of 2014, DEA
agents arrested Harmon and in searches of various residences
and vehicles belonging to Harmon or other drug associates
connected to the Harmon DTO, officers seized approximately 5
kilograms of methamphetamine and approximately $128,674 in
United States currency derived from the sale of
methamphetamine.

The defendant, House, has a prior drug conviction
for possession of controlled substance in the Circuit Court of
Greene County, Missouri, with a Case No. 1231-CR02683-01 with
a date of conviction of on or about June 8, 2012. The effect
of the prior conviction relating to the controlled substance
is that House is subject to a mandatory minimum sentence of 20

years imprisonment on Count 1 and other punishment as set
forth in 21 United States Code, Section 841(a)(1) and
(b)(1)(A).  And he's also subject to a statutory maximum
sentence of 30 years for Count 25 and other punishment as set
forth in 21 United States Code, Section 841(b)(1)(C).

Thank you, Your Honor, for allowing me to read that.

THE COURT:  Mr. House, were you able to hear
Mr. Eggert?

THE DEFENDANT:  Yes, sir.

THE COURT:  Were you also reading along with what he
was reading from?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there anything that was read by
Mr. Eggert that you think is inaccurate?

THE DEFENDANT:  No, sir.

THE COURT:  The statement read described certain
conduct by you.  Are the things that he read concerning your
conduct, does that accurately describe your conduct?

THE DEFENDANT:  Yes, sir.

THE COURT:  Any further record under Rule 11 which
the government wants me to make?

MR. EGGERT:  No, Your Honor.  Thank you.

THE COURT:  Mr. Johnson, any further record you want
me to make?

MR. JOHNSON:  No, sir.

23

```
 1              THE COURT:  All right.  Mr. House, I have completed
 2    the areas of inquiry that I need to complete.  We reminded you
 3    of some of the consequences of a guilty plea and of your
 4    rights that you're giving up -- or that you're not taking
 5    advantage of, I should say, by changing your plea.  Do you
 6    still wish to change your plea to Count 1 of the second
 7    superseding indictment?
 8              THE DEFENDANT:  Yes, sir.
 9              THE COURT:  And you still think it's in your best
10    legal interest?
11              THE DEFENDANT:  I do, sir.
12              THE COURT:  And how do you wish to plea now to Count
13    1 of the second superseding indictment?
14              THE DEFENDANT:  Guilty, sir.
15              THE COURT:  And are you entering that plea because
16    you are indeed guilty of the crime alleged in that count?
17              THE DEFENDANT:  Yes, sir.
18              THE COURT:  How do you wish now to plead to Count 25
19    of the second superseding indictment?
20              THE DEFENDANT:  Guilty, sir.
21              THE COURT:  Is that because you are indeed guilty of
22    the crime alleged in Count 25 of the second superseding
23    indictment?
24              THE DEFENDANT:  Yes, sir.
25              THE COURT:  And do you agree to Forfeiture
```

24

1   Allegations 1 and 2 as described in the second superseding

 2   indictment?

 3           THE DEFENDANT:  I do, sir.

 4           THE COURT:  The Court finds that the defendant is

 5   competent to enter a change of plea.  The Court finds that the

 6   defendant has entered the change in his pleas in an

 7   understandingly, knowingly and voluntary manner.  The Court

 8   finds that the guilty pleas have been entered after the

 9   defendant has received full, competent and capable services

10   and advice of legal counsel and after the defendant has been

11   fully advised of the consequences of entering the guilty

12   pleas.  The Court finds that there is a factual basis for the

13   guilty pleas to Counts 1 and 25.  The Court therefore accepts

14   the defendant's pleas of guilty to Count 1 and 25 of the

15   superseding indictment.  The Court accepts the defendant's

16   admission to the Forfeiture Allegations 1 and 2 of the second

17   superseding indictment.  The Court, based on the plea, finds

18   the defendant guilty of the crime as alleged in Counts 1 and

19   25 of the second superseding indictment.

20           I am going to order a presentence investigation

21   report to be prepared.

22           What happens now is the report is written.  You'll

23   get an opportunity to have input into that report if you want

24   to.  That's between you and your lawyer.  In any regard, when

25   the report's complete, you'll get a copy of it and it will

                                25

tell us a lot about your involvement in this particular crime -- these crimes but also your criminal history but it will also tell us about your educational background, your family background, your health, your employment background, a lot of things about what's been going on in your life. When that report is done -- and one of the important parts of that report, by the way, it will include a calculation of the sentencing guidelines.

When that's done, you and your lawyer will get a copy of it and you'll have an opportunity to review it. If you think there are errors in it, you and your lawyer can contact the probation office and try to work them out. If they can't be worked out, then you can file formal objections, especially if you think the sentence calculation is -- guideline calculation is incorrect. And on the day of your sentencing, then I'll rule on those objections.

At your sentencing the first thing we'll do is remind you of what the authorized sentence is by the Congress. As I've told you more than once and I'll repeat again, I have to sentence you in a manner that's been authorized by the law enacted by the Congress. Then we'll calculate your sentencing guidelines, ruling on those objections I told you about. That requires me, again, to get a criminal history category for you and an offense level for you. Then we'll listen to arguments by the two lawyers on the factors that are described in the

26

law at a place called Title 18, Section 3553(a).  That's a lot
of factors that the Court is to consider in sentencing you.
And in it I will determine whether or not the sentencing
guideline is appropriate for you or whether I should depart or
vary from that guideline in your sentence.  A variance or
departure can sometimes be above the guideline, it's often
below the guideline if I find that a departure or variance is
appropriate in your case.

When that's done, at your sentencing hearing I'll
give you a chance to say something to me.  You don't have to
say anything, but if you want to say something, I will afford
you that opportunity.  And if you think you're going to take
advantage of that opportunity, please discuss it with your
lawyer about what you plan to say before the sentencing
hearing.  You can get the benefit of his advice as how best to
phrase things and what things may sometimes be better left
unsaid.  Again, you don't have to say anything.

At the end of your sentencing hearing, I will tell
you what your sentence is.  I'll announce your sentence at the
end of that sentencing hearing.  But I won't make any final
decision until we go through that hearing process and you're
afforded an opportunity to make a statement, if you want to.

Do you understand how we're going to handle this
now?

THE DEFENDANT:  Yes, sir.

```
 1                THE COURT:  Between now and your sentencing you'll
 2    be in the custody of the marshals and they will house you at a
 3    local facility.  I don't know how long it will be before we
 4    can get your sentencing hearing scheduled.  It depends on a
 5    lot of things.  But whenever we do get it scheduled and once
 6    you get your sentence and I announce your sentence, then
 7    obviously you would be transferred to the Bureau of Prisons
 8    for the completion of any prison time you would be ordered to
 9    serve.  You understand?
10                THE DEFENDANT:  Yes, sir.
11                THE COURT:  Anything further from the government we
12    need to cover?
13                MR. EGGERT:  No, Your Honor.  Thank you.
14                THE COURT:  Mr. Johnson, anything further defendant
15    thinks we need to cover?
16                MR. JOHNSON:  No, sir, Your Honor.
17                THE COURT:  All right.  We'll see you back at your
18    sentencing hearing, then.
19                We'll be in recess.
20                (Court stands in recess at 2:42 p.m.)
21
22
23
24
25
```

28

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2        I, Jeannine M. Rankin, Federal Official Court Reporter,

 3   in and for the United States District Court for the Western

 4   District of Missouri, Southern Division, do hereby certify

 5   that the foregoing is a true and correct transcript of the

 6   stenographically reported proceedings.

 7

 8

 9

10

11                         /s/ Jeannine M. Rankin

12   Date:     08/23/17      Jeannine M. Rankin, CCR, CSR, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25
```